IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

*ELECTRONICALLY FILED*

| | | |
|---|---|---|
| SUSAN E. MORGAN et al., on behalf of themselves and a class of similarly situated plaintiffs, | ) ) ) ) | Case No.:  3:12-CV-00818-CRS<br>Hon. Charles R. Simpson, III |
| PLAINTIFFS<br>v. | ) ) ) ) | |
| PADUCAH & LOUISVILLE RAILWAY, INC. et al. | ) ) ) | |
| DEFENDANTS | ) ) | |

**JOINT MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT**

## I. INTRODUCTION

Plaintiffs Susan E. Morgan and Michael C. Smith and Defendants Paducah & Louisville Railway, Inc., P&L Transportation, Inc., Four Rivers Transportation, Inc. (together with Paducah & Louisville Railway, Inc. and P&L Transportation, Inc., "P&L"), R.J. Corman Derailment Services, LLC ("RJ Corman"), Center for Toxicology and Environmental Health, LLC ("CTEH"), RAE Systems, Inc. ("RAE"), Honeywell International Inc. ("Honeywell") and CSX Transportation, Inc. ("CSXT," and collectively, "Defendants") seek final approval of the proposed class action settlement of this lawsuit involving the train derailment that occurred on October 29, 2012, the flash and fire that occurred on October 31, 2012, any environmental release(s) and the cleanup that occurred near West Point, Kentucky, beginning on October 29, 2012 (the "Incidents").  Plaintiffs and Defendants are collectively the "Parties."  The proposed

settlement requires Defendants to pay a total of $3,125,000 for the benefit of the Settlement

Class.  The Parties reached this proposed settlement during a mediation conducted by United

States Magistrate Judge David Whalin on February 5 and 6, 2014.

This Court preliminarily approved the settlement on August 27, 2014.  D.E. 75.  The

Court certified a settlement class under Federal Rule of Civil Procedure 23, and preliminarily

determined "that the proposed Settlement Agreement is the product of informed, arm's length

negotiation by counsel and is presumptively fair, just, reasonable, valid and adequate, subject to

any objections that may be raised at the Fairness Hearing."  *Id*. at 5.  The Court also directed a

notice plan under which Class Counsel and the Settlement Administrator would notify absent

class members of the proposed settlement.  *Id*. at 6-8.

Neither class representative objects to the settlement.  Although Michael Smith initially

filed an objection, he has requested its withdrawal and filed a sworn declaration explaining his

reasons for doing so.  D.E. 80.  The other class representative, Susan Morgan, has exercised her

right to opt out.

The notice plan has been completed and the response from class members has been

overwhelmingly positive.  Out of the approximately 5,600 class members, there are no

objections, and only 15 class members have opted out.  *See* Ex. A (Affidavit of Edgar C. Gentle,

III).  Approximately 525 class members have submitted claim forms.  *Id.*  The absence of

objections and the exceedingly low level of opt-outs—just 0.27 percent of the class—confirm

this Court's preliminary conclusion that the settlement brokered by Judge Whalin is fair to absent

class members.

As the Court is aware, settlement funds will be distributed according to a matrix that

establishes set payment amounts ("Ordinary Monetary Benefits") to each individual member of

the Settlement Class.  The payment matrix sets different amounts for class members in each of

three tiers; the set payment amount decreases as the class member's distance from the derailment

site increases.  Class members do not need to demonstrate any actual damages in order to collect

Ordinary Monetary Benefits.  The proposed settlement also allows class members who can

demonstrate actual damages in excess of the Ordinary Monetary Benefits to make claims for

"Extraordinary Damages," permitting the class member to recover his or her actual damages

proved, up to a cap of $7,500.

The Sixth Circuit has identified seven factors to guide the assessment of whether a class-

action settlement is "fair, reasonable, and adequate" for purposes of granting final approval.  *See

Int'l Union, United Auto., Aerospace, and Agric. Implement Workers of Am. v. Gen. Motors

Corp.*, 497 F.3d 615, 631 (6th Cir. 2007) ("*Int'l Union*").  Those factors are met here.  First,

there is no risk of fraud or collusion; this Court has already found that the settlement is "the

product of informed, arm's length negotiation by counsel."  D.E. 75, at 5.  Second, litigating this

complex case through a trial and subsequent appeal could take years and cost the Parties millions

of dollars in litigation costs and expert fees.  Third, preliminary discovery has enabled counsel to

assess the merits of the case and recommend settlement.  Fourth, Plaintiffs faced an uphill battle

in litigating this case to a successful verdict through what would inevitably have been extensive

discovery and motion practice.  Fifth, Class Counsel has endorsed the settlement and neither of

the class representatives objects.  Sixth, class members have reacted very positively to the

settlement:  there are no objectors and a mere 15 opt-outs from a class of approximately 5,600.

Seventh, the settlement is in the public interest.

For all these reasons, the Settlement Agreement is fair, reasonable, and adequate, and the

Parties respectfully request that this Court grant final approval.

## II. <u>PROCEDURAL HISTORY</u>

**A.**     **<u>The Train Derailment</u>**

Shortly after 6:00 a.m. local time on October 29, 2012, Paducah & Louisville Railway's train derailed near West Point, Kentucky.  The derailed train consisted of 57 cars, 13 of which actually derailed.  Two cars were breached during the derailment, one containing 1,3 butadiene, and the other containing styrene.  Local, federal, and private emergency response organizations, including P&L personnel, responded to the derailment.  According to fire officials, there were 32 homes evacuated, and those living within 2.5 miles of the derailment site were asked to shelter-in-place.

Environmental assessment and cleanup activities began late in the evening on October 29, 2012.  CTEH set up air monitors manufactured by RAE Systems.  RJ Corman, which specializes in derailment-related services, also arrived that evening.  On October 30, RJ Corman and other contractors began preparing the site for removal of the derailed cars.

On October 31, during operations at the derailment site to separate and move the railcars, a cutting torch accidentally ignited a fire.  Under the direction of the local fire authority, the fire was allowed to burn under controlled conditions for approximately three days.  All residents within 1.2 miles were ordered to evacuate, and a shelter-in-place warning was issued for people within five miles of the derailment.  The warning was lifted the afternoon of November 1, and the evacuation order remained in place until early evening of November 4.

On November 4, cars containing hydrogen fluoride ("HF") were repositioned.  That morning, officials issued a shelter-in-place warning for residents within a five-mile radius of the derailment.  The warning was lifted in the early evening that same day.  Also on the evening of November 4, residents within a 1.2-mile radius, who had been asked to evacuate after the fire on October 31, were allowed to return to their homes.

On November 13, an HF car and a different butadiene car were transloaded.  During the transload, a 0.5-mile evacuation order was put into effect.  Due to access and egress issues with Katherine Station Road and Abbots Beach Road, all residents on those roads were evacuated as well.  A total of 31 homes were affected by the evacuation.  On November 14, residents inside the road closure area of Dixie Highway were required to continue the 0.5-mile evacuation, but West Point residents outside of the Dixie Highway closure were allowed to return to their homes.  By November 15, the 0.5-mile evacuation order was lifted entirely.

Plaintiffs are individuals or businesses that reside or own real property in the vicinity of the derailment, and who allege that they suffered various damages and/or were forced to evacuate, shelter-in-place, or take detours as a result of the Incidents.  Plaintiffs assert claims for nuisance; trespass; negligence; strict liability; manufacturing and design defect; and res ipsa loquitur.  Defendants deny any wrongdoing.

## B.    Parties to the Settlement

The named Plaintiffs are residents of West Point, Kentucky, which is part of Hardin County.  They own real property in West Point.  Mr. Smith also operates a business there.  They allege inconvenience, personal injury, emotional distress, property damages, business losses and other damages in connection with the Incidents.  Plaintiffs represent a class of similarly-situated persons and businesses that reside or own property in the area immediately surrounding the derailment.  The Settlement Class is defined as:

> All Persons[1] residing (as their primary residence) or owning real property or maintaining a place of business between October 29, 2012 and December 31, 2012 in an area identified on the map

---

[1] "Persons" is defined in the proposed settlement as "a natural person, individual, business, corporation, association, limited liability company, partnership, limited partnership, joint venture, affiliate, and any other type of legal entity and their respective spouses, heirs, predecessors, successors, executors, administrators, representatives or assigns."

attached as Exhibit B as the "Class Area."  The class area consists of a circle with a five-mile radius that is centered on the derailment site.

The Defendants are P&L, RJ Corman, CTEH, RAE, Honeywell and CSXT.

## C.    The Litigation

Ms. Morgan and Mr. Smith were among four named plaintiffs in a class action complaint arising from the Incidents that was originally filed in Hardin Circuit Court, Division III, Kentucky, Civil Action No. 12-C1-2230, on November 20, 2012.  That litigation was styled *Brown et al. v. Paducah & Louisville Railway, Inc., et al*.  Defendants removed the state court case to the U.S. District Court for the Western District of Kentucky.  After this Court denied Plaintiffs' remand motion, Plaintiffs filed an amended complaint.  Two of the four named plaintiffs on the original complaint were not named in the amended complaint, while two others — Ms. Morgan and Mr. Smith — remained as named plaintiffs.  The lawsuit, which was restyled *Morgan et al. v. Paducah & Louisville Railway, Inc. et al.*, sought certification of a class of individuals and businesses alleging that the Incidents caused inconvenience, personal injury, emotional distress, real property damage and/or business losses.

Magistrate Judge Whalin conducted a formal, two-day settlement conference in February 2014 in which the Parties agreed to settle this case.  On April 2, 2014, the Parties filed the proposed Settlement Agreement and Motion for Preliminary Approval of the settlement.  D.E. 68.  On June 2, the Court entered an order requesting additional information from the Parties on a number of the settlement terms, and scheduled a Preliminary Approval Hearing for June 23. D.E. 69.  The Parties appeared before the Court on June 23.  On August 27, the Court granted preliminary approval of the settlement, directing notice to the Settlement Class in accordance with the deadlines set forth in the Court's Order, and setting a Fairness Hearing for November 18, 2014.  D.E. 75.  The Settlement Administrator and the Parties have completed the notice plan

described in the Preliminary Approval Order.  The proposed settlement agreement is now ripe

for final approval by the Court.

### III.     THE TERMS OF THE PROPOSED SETTLEMENT

The settlement would resolve the claims of all members of a Settlement Class of

individuals and businesses residing or owning property or maintaining a place of business

between October 29, 2012 and December 31, 2012 within a radius of five miles from the

derailment site.  In exchange for resolution, a total sum of $3,125,000 would be paid by

Defendants.  Notice and distribution of sums to persons eligible for compensation are to proceed

according to the settlement agreement and under the supervision of a Settlement Administrator.

Defendants, in return for the payment of $3,125,000, are to be entirely released of liability,

without any admission of wrongdoing.  Other important elements of the settlement are

(1) payment of all costs and expenses of notice to Settlement Class Members, (2) opt-out

provisions to be afforded members of the Settlement Class, (3) payment of all Settlement

Administrator fees and costs, (4) payment of all of Class Counsel's attorney's fees and expenses,

(5) possible incentive awards to Settlement Class Representatives, and (6) a "Cy Pres Fund" to

consist of sums remaining after adjustment and payment of all Settlement Class Member claims.

The proposed settlement will provide substantial monetary benefits to the Settlement

Class Members.  Specifically, the Settlement Administrator will pay "Ordinary Monetary

Benefits" to Settlement Class Members for alleged inconvenience damages, alleged personal

injury damages and alleged property damages.  Payment amounts are graduated based on three

geographical zones with higher payment amounts for the zones closer to the derailment site.  The

exact amount of the Ordinary Monetary Benefits will depend on the number of claims received

and other related variables.  Nevertheless, utilizing reasonable assumptions regarding claimant

participation rates (just under 50% for the entire Class Area) and other key variables, the Parties

expect a family of four living in their own home within Tier 1 (the tier closest to the derailment site consisting of residents of 32 homes first forced to evacuate on October 29, 2012) to receive up to $5,889.  A similar family in Tier 2 (consisting of residents within a 1.2-mile radius of the derailment site—not including the residents comprising Tier 1—who were first evacuated on October 31, 2012) would receive up to $3,533.  And, a similar family in Tier 3 (consisting of residents greater than 1.2 miles from the derailment site, but less than 5 miles from the derailment site) would receive up to $1,177.  Proof requirements for Ordinary Monetary Benefits are limited to proof of residency or property ownership within the relevant area between October 29 and December 31, 2012.

In addition, Settlement Class Members who believe they have suffered actual damages greater than the Ordinary Monetary Benefit amounts may make an individual claim for "Extraordinary Damages."  An Extraordinary Damages claim is made in lieu of a claim for Ordinary Monetary Benefits.  Extraordinary Damages claim amounts will be adjusted on an individual claim basis, but are capped at $7,500.  Extraordinary Damages claims are also subject to more rigorous proof requirements.  Most importantly, the claimant must demonstrate that the Extraordinary Damages were caused by the Incidents.  Payment amounts are limited by the Settlement Fund, and as a result, if claims exceed the Parties' expectations, payment amounts may need to be reduced on a proportionate basis to meet the limitations of the Settlement Fund.

Finally, in the immediate aftermath of the derailment, P&L established a claims processing effort to compensate individuals and businesses for damages, losses, or other inconvenience and disruption arising from the derailment.  This P&L claims process resulted in payments of approximately $1.1 million to persons living, working or owning property within the proposed class area, and included payments for the types of damages that are sought on

behalf of the proposed class in the litigation.  The proposed class settlement agreement contains a covenant that precludes double recoveries for previously compensated losses and off-sets these prior P&L payments against awards from the Settlement Fund on an individual claimant basis. This provision is intended to ensure an equitable distribution of the proposed class settlement funds.

A detailed description of the Settlement Fund and the allocation mechanism of the funds to the Class members is included with the Individual Notice that was previously submitted to the Court as Exhibit B-3 to the Parties' Joint Motion for Preliminary Approval (D.E. 68).

## IV.    FINAL APPROVAL OF THE SETTLEMENT IS WARRANTED

The Settlement is fair, reasonable, adequate, and worthy of final judicial approval.

### A.    The Standard for Final Approval

Pursuant to Federal Rule of Civil Procedure 23(e), after the Court directs notice to class members and before granting final approval of the proposed settlement, the Court must conduct a fairness hearing and determine whether the proposed settlement is "fair, reasonable and adequate."  The Sixth Circuit has underscored "the federal policy favoring settlement of class actions."  *Int'l Union*, 497 F.3d at 632.  "[T]here is a strong public interest in encouraging settlement of complex litigation and class action suits because they are notoriously difficult and unpredictable and settlement conserves judicial resources."  *In re Skechers Toning Shoe Products Liab. Litig.*, 3:12-CV-00204, 2013 WL 2010702 (W.D. Ky. May 13, 2013) at *7 ("*Skechers*") (quotation marks omitted).

The Sixth Circuit has identified seven factors to guide courts in determining whether a settlement is "fair, reasonable and adequate" under Rule 23:

> (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the

> merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest.

*Int'l Union,* 497 F.3d at 631. "No one of these factors is dispositive. Rather, all are to be weighed and considered in light of the particular demands of the case." *Skechers*, 2013 WL 2010702, at *3.

The Sixth Circuit accords district courts broad discretion in granting final approval to class-action settlements. *See Laskey v. Int'l Union, United Auto., Aerospace and Agr. Implement Workers of Am.(UAW)*, 638 F.2d 954, 957 (6th Cir. 1981).

**B.      The Proposed Settlement Satisfies the Standard for Final Approval**

An analysis of the *International Union* factors as applied to this case demonstrates that the proposed settlement is fair, reasonable and adequate.

### 1.      The risk of fraud or collusion

"Courts presume the absence of fraud or collusion in class action settlements unless there is evidence to the contrary." *Thacker v. Chesapeake Appalachia, L.L.C.*, 695 F. Supp. 2d 521, 531 (E.D. Ky. 2010), *aff'd sub nom. Poplar Creek Dev. Co. v. Chesapeake Appalachia*, 636 F.3d 235 (6th Cir. 2011) (quotation marks omitted). Here, there is no allegation—let alone evidence—of fraud or collusion.

This Court has already found that the proposed settlement is "the product of informed, arm's length negotiation by counsel." D.E. 75, at 5. The proposed settlement was reached after extensive evaluation—based upon the experience of counsel in similar matters—of the facts and Plaintiffs' likelihood of success on the merits. The Parties reached this proposed settlement following a two-day mediation facilitated by Magistrate Judge Whalin in February 2014 that extended until after midnight on the second day. Every step in the mediation session was hard fought and there was no fraud or collusion.

### 2.      The complexity, expense and likely duration of the litigation

"In evaluating a proposed settlement, the Court must also weigh the risks, expense and delay the plaintiffs would face if they continued to prosecute the litigation through trial and appeal." *Thacker*, 695 F. Supp. 2d at 531.

The anticipated complexity, expense and duration of additional litigation are all significant.  This case involves multiple Defendants, each of whom has vigorously contested liability.  Continued prosecution of this case would involve numerous legal and factual issues that would require extensive written discovery and many depositions.  Expert discovery alone would cost hundreds of thousands of dollars.  In all likelihood, there also would be extensive motion practice, including, for example, *Daubert* motions and motions for summary judgment. Further litigation, which could include one or more appeals to the Sixth Circuit, would be time consuming and expensive.

The Settlement Agreement will provide the class with a recovery much sooner than would otherwise be possible.  "Undoubtedly, this relief is preferable to the possibility of a smaller recovery, or none at all, after an expensive and protracted trial and appeal are completed." *Thacker*, 695 F. Supp. 2d at 531.

### 3.      The amount of discovery engaged in by the parties

"Although the amount of discovery completed is a factor to be considered in the settlement approval process, there is no minimum or definitive amount of discovery that must be undertaken to satisfy this factor." *Bowers v. Windstream Kentucky East, LLC*, 2013 WL 5934019 (W.D. Ky. Nov. 1, 2013), at *2.

Class Counsel conducted substantial informal discovery regarding the Incidents.  Class Counsel invested significant time and resources in research including filing and review of FOIA

requests; open records requests from numerous agencies including Louisville - Jefferson County Emergency Management, Kentucky Emergency Management, and Kentucky Division of Waste Management.  Further, Counsel invested time in reviewing previous train derailments and related lawsuits filed in Kentucky, PACER searches related to train derailment lawsuits and settlements and library searches of the Kentucky EPA for information about the chemicals involved in the Incidents and the dangerous nature of those chemicals.  Class Counsel continued to search the Courier Journal library extensively for previous derailment sites and all articles related to this derailment.  Class Counsel spent many hours mapping the impacted area and developing a detailed timeline of the events through the news stories and emergency response records received through informal discovery.  Class Counsel retained a mapping expert from the University of Louisville to assist with the mapping effort. Class Counsel also retained a licensed Ph.D. psychologist to interview and examine numerous class members to determine the past, present and future mental impact of the derailment.  Class Counsel retained an expert to assist in determining the population within the five-mile radius of the derailment. Class Counsel used social media and other third-party sources of information to research the background of the engineer and other employees involved in the derailment. Finally, Class Counsel opened and staffed a temporary office for approximately three months in West Point, and held Town Hall meetings to inform the public and Class Members about information Counsel obtained from informal discovery.

Defense counsel also performed significant informal discovery.  They hired expert environmental consultants to analyze the various environmental data collected in the wake of the Incidents.  This work included detailed modeling work aimed at determining whether, in light of prevailing winds, topography and the chemicals at issue, there could have been any

contamination outside the immediate area of the derailment.  The air modeling results showed that the butadiene dispersed over a sparsely populated area.  It did not reach West Point or Abbots Beach Road and it did not flow over the river.

Defense counsel also collected and reviewed data from the monitoring stations set up throughout the region to determine whether there were any chemicals present in the air, water or soil.  CTEH began monitoring air quality on the night of the derailment, and continued monitoring over the next several weeks to measure airborne concentrations of volatile organic compounds (including butadiene and styrene), as well as hydrogen fluoride.  CTEH collected thousands of air sampling data points.  The air monitoring data demonstrated that with the exception of a very small area in the immediate vicinity of the derailment, there were no exceedances of the conservative OSHA screening levels for the hazardous materials at issue over the relevant time period attributable to the derailment.  Defendants' environmental consultants also collected hundreds of soil and groundwater samples immediately following the derailment, and installed groundwater monitoring wells a few weeks after the derailment.  The data showed that the butadiene did not contaminate the ground of any Class Member's residence or the Ohio or Salt Rivers.  Defendants' environmental consultants also collected surface water samples every other day at four locations in the Salt and Ohio Rivers.  Sampling and analysis indicated no contamination in the downstream area due to the derailment.

Much of this data and analysis was presented during the two-day mediation, which enabled both sides to make informed judgments about the strength of their respective positions.

### 4.    The likelihood of success on the merits

In *International Union*, the Sixth Circuit explained that although the fairness inquiry does not require the Court to "'decide the merits of the case or resolve unsettled legal questions,'" in

order to evaluate the fairness of the proposed settlement, the Court must "'weigh[] the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in settlement.'" 497 F.3d at 631 (quoting *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n. 14 (1981)).

Defendants have vigorously disputed liability, causation of Plaintiffs' alleged injuries, and damages.  At trial, Defendants would argue—based on the results of the extensive environmental monitoring performed in the wake of the derailment—that the derailment and resulting chemical release did not produce contaminants at a level sufficient to cause harm to any member of the proposed class.  Consistent with Defendants' position, several days after the derailment, a U.S. Environmental Protection Agency spokesman said that "[t]he state of the environment is good," and sampling "continues to show that there are no immediate concerns about contamination."  The Kentucky Department of Environmental Protection similarly determined that "except for the initial release of butadiene, there were no measurable amounts of any chemicals in the surrounding community"—and even as to butadiene, "concentrations were never at a level that could be considered acutely dangerous outside of the immediate area of the release."  *See* Ex. C (Kevin Strohmeier, Emergency response: KDEP takes the lead on train derailment, 24 Land Air & Water no. 2 at pp. 5, 8 (2013)).  Defendants almost certainly would file motions for summary judgment on multiple legal grounds, and would also likely challenge class certification.  In short, Plaintiffs faced substantial hurdles in litigating this case to a successful outcome.  At the same time, Class Counsel were fully prepared for additional litigation, including trial if necessary.  Class Counsel created and maintained an extensive database with detailed information on particularized injuries for hundreds of plaintiffs in the West Point area.  They maintained a temporary office in West Point.  They conducted focus

groups with potential bellwether plaintiffs.  In the view of Class Counsel, the evacuation and shelter-in-place orders ensured that certain elements of damages were highly similar for large numbers of class members.  Additionally, and separately from the action pending before this Court, Class Counsel filed four separate state court complaints in Hardin Circuit Court in October 2013 on behalf of more than 100 individual plaintiffs.  Litigating these state court cases, and holding jury trials for each plaintiff, would have been time consuming and expensive for all parties.

By contrast, the proposed settlement provides the Settlement Class certain and substantial relief without the risks and delays of continued litigation, trial, and appeal.  It provides monetary benefits to the Settlement Class—with minimal proof requirements—that likely equal or exceed their actual damages.  Most members of the Settlement Class will receive the "Ordinary Monetary Benefit."  In order to receive this payment, a person need only prove class membership, that is, that he resided (as his primary residence) or owned real property or maintained a place of business between October 29, 2012 and December 31, 2012 within the Class Area.  Any member of the Settlement Class who believes that his actual damages exceed the Ordinary Monetary Benefit may submit a claim for Extraordinary Damages, which may result in payments of up to $7,500.  In sum, the proposed settlement is fair when viewed in the light of Plaintiffs' ultimate likelihood of success on the merits.

### 5.    The opinions of class counsel and class representatives

In evaluating whether a proposed settlement warrants final approval, "the informed and reasoned judgment of plaintiffs' counsel and their weighing of the relative risks and benefits of protracted litigation are entitled to great deference."  *Skechers*, 2013 WL 2010702 at *6 (quoting *Thacker*, 695 F. Supp. 2d at 532).  Here, Class Counsel believe the settlement is fair and

reasonable.  Among other things, Class Counsel's belief is based on a comparison of this settlement with agreements reached in other train derailment and evacuation class actions, including the highly similar Brooks derailment of 2007 in nearby Bullitt County.  *In re Bullitt County Train Derailment Litig.*, No. 3:07-cv-00024 (W.D. Ky. Aug. 14, 2008).  Indeed, the factual nature of the derailment in *Bullitt County*, and the $3 million settlement fund approved in that case, were the subject of numerous comparisons by Class Counsel, defense counsel, and Judge Whalin.  *See id.* at D.E. 108 (describing the class area, the amount of the settlement, and the reasons for preliminary approval).

Here, neither class representative objects to the settlement.  Although Michael Smith initially filed an objection, he has requested its withdrawal and filed a sworn declaration explaining his reasons for doing so.  *See* D.E. 80.  The other class representative, Susan Morgan, has exercised her right to opt out.  Of course, even in situations—unlike this one—where the class representatives *oppose* a settlement, that "does not prove that the interests *of the class* were not protected."  *Laskey*, 638 F.2d at 957 (affirming final approval of class settlement despite objections from three of four class representatives) (emphasis added).  Indeed, the leading class-action treatise explains that "class counsel can settle a case over the representative's objections," William B. Rubenstein, *Newberg on Class Actions* § 3.82 (5th ed. 2011), and the Sixth Circuit has approved class-action settlement over the active opposition of class representatives.  *See, e.g.*, *Moulton v. United States Steel Corp.*, 581 F.3d 344, 351 (6th Cir. 2009).  Where, as here, *no* class representative opposes the settlement, this factor weighs in favor of approval.

### 6. The reaction of absent class members

The proposed settlement has met with widespread approval among absent class members.  Indeed, not a single absent class member has objected.  This cuts powerfully in favor of

approval.  *See Skechers*, 2013 WL 2010702, at *7 (based on the dearth of objections, "the Court concludes that the overwhelming majority of the potential class members have no objection to the proposed settlement, and this weighs in favor of settlement"); *Thacker*, 695 F. Supp. 2d at 533 (same).  Similarly, only a miniscule fraction of class members—15 out of approximately 5,600, or about 0.27 percent—have opted out.  *See* Ex. A.  Moreover, the majority of those opting out of the settlement filed separate lawsuits well before the preliminary approval of the settlement in this case.  "[T]he fact that so few [opt-outs] have been filed weighs in favor of approval."  *Skechers*, 2013 WL 2010702, at *7.  Finally, approximately 525 class members have submitted claim forms.  Ex. A.

The high rate of participation is further evidence that the settlement is fair and reasonable.  Participation rates so far appear to be highest in Tiers 1 and 2, the areas closest to the derailment site.  Participation also is strong in Tier 3, where residents were subject to a shelter-in-place order instead of a series of evacuations.  Based on the above numbers so far, the overall participation rate likely will exceed 10 percent, and it may be as high as 50 percent in Tiers 1 and 2.  This would easily be in the range of claims approval rates in other class action settlements. In these cases, participation rates in general rarely exceed 50 percent and often are far lower.  *In re TJX Cos. Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395, 404 (D. Mass. 2008) (it is "not unusual for only 10 or 15% of the class members" to file claims in similar cases).  In another case involving wireless phone insurers, a court finally approved a settlement with a claims rate as low as 1.1 percent.  *See Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1377, 1384 (S.D. Fla. 2007). Even cases with participation rates below 1 percent have received final approval.  *Berry v. Volkswagen Group of Am. Inc.*, 2012 Mo. App. LEXIS 801 (Mo. App. June

12, 2012) (noting approval of settlement despite 130 valid claims being received, compared to 22,304 notices mailed to consumers).

### 7.     The public interest

"[T]here is a federal policy favoring settlement of class actions."  *Thacker*, 695 F. Supp. 2d at 533.  Specifically, "there is a strong public interest in encouraging settlement of complex litigation and class action suits because they are notoriously difficult and unpredictable and settlement conserves judicial resources."  *Skechers*, 2013 WL 2010702, at *7 (punctuation omitted).  This settlement serves the public interest because it will conserve judicial resources while providing fair compensation to class members without delay or the risks of litigation.  *See id*. ("The Court finds that the proposed settlement serves the public interest by resolving potentially complex legal proceedings and preserving significant judicial resources that would be expended should this action proceed to additional discovery and trial.").  Moreover, the Parties have provided the requisite notice to the Attorneys General for the United States, the Commonwealth of Kentucky and the State of Indiana, who are charged with protecting the public interest.  These Attorneys General have not raised any questions or concerns about the proposed settlement.

### V. THE RULE 23(E) NOTICE REQUIREMENTS HAVE BEEN SATISFIED

Federal Rule of Civil Procedure 23(e) requires that "notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs."  In order to satisfy the requirements of Rule 23(e) and due process, "[a]ll that notice must do is 'fairly apprise . . . prospective members of the class of the terms of the proposed settlement' so that class members may come to their own conclusions about whether the settlement serves their interests.'"  *Gooch v. Life Inv. Ins. Co. of Am.*, 672 F.3d 402, 423 (6th Cir. 2012) (quoting *Int'l Union*, 497 F.3d at 630).

18

In granting preliminary approval, the Court found that the proposed method of notice "is the best notice practicable under the circumstances," and "complies in all respects with the requirements of Rule 23 and all the requirements of due process."  D.E. 75.  Class Counsel and the Settlement Administrator have now completed all steps of the notice program as directed by the Court.

As explained in the attached declaration from the Settlement Administrator, individual notice was provided to 2,526 addresses potentially within the Class Area.  Ex. A.  Of this number, 102 notices were returned as undeliverable.  *Id.*  Skip trace efforts identified 55 alternative addresses for these returned notices, and the Settlement Administrator provided supplemental individual notices to those addresses.  *Id.*  The Settlement Administrator also established a toll-free number to answer questions about the settlement, and provided information on the settlement website, www.westpointderailment.com, including the settlement agreement itself, the individual notice and the claim form.  *Id.*  The Published Notice appeared in *The Louisville Courier-Journal* on September 14 and 21, 2014.  *Id.*  This notice program resulted in individual notice to almost all class members, and provided absent class members numerous avenues to obtain additional information, ask questions and file the claims paperwork.  In addition to the steps set forth in the notice plan approved by the Court, the Settlement Administrator held a series of town hall meetings in West Point on November 1, 2014 to describe the proposed settlement and help claimants complete the claim forms.  *Id.*  Class Counsel from all three law firms representing plaintiffs attended this series of meetings, answering questions and assisting with claim form completion. This notice program satisfies the minimum requirements of Rule 23 and due process.

## VI.    FINAL CERTIFICATION OF THE SETTLEMENT CLASS

For the reasons detailed in Plaintiffs' Motion for Certification of Settlement Class (D.E. 67), Plaintiffs respectfully request that the Count finally certify the proposed Settlement Class. Defendants do not oppose class certification for purposes of settlement only.

## VII.    CONCLUSION

The Parties respectfully request that the Court enter an Order finding that the proposed settlement is fair, reasonable and adequate under Rule 23 of the Federal Rules of Civil Procedure.  A proposed final approval order is attached.

Dated:  November 10, 2014                          Respectfully submitted,

Edward H. Stopher                                  /s/ Thomas H. Dupree, Jr.
Rod D. Payne                                       Thomas H. Dupree, Jr.
BOEHL, STOPHER & GRAVES, LLP                       Michael K. Murphy
400 W. Market Street, Suite 2300                   GIBSON, DUNN & CRUTCHER LLP
Louisville, Kentucky 40202                         1050 Connecticut Avenue, N.W.
Telephone:  (502) 589-5980                         Washington, DC 20036
Facsimile:  (502) 561-9400                         Telephone:  (202) 955-8500
estopher@bsg-law.com                               Facsimile:  (202) 467-0539
rdpayne@bsg-law.com                                tdupree@gibsondunn.com
                                                   mmurphy@gibsondunn.com

*Counsel for Defendant CSX Transportation, Inc.*

/s/ Samuel D. Hinkle  w/permission
Samuel D. Hinkle IV
Douglas C. Ballantine
Christopher E. Schaefer
STOLL KEENON OGDEN PLLC
500 West Jefferson Street, Suite 2000
Louisville, Kentucky 40202
Telephone:  (502) 333-6000
Facsimile:  (502) 333-6099
sam.hinkle@skofirm.com
douglas.ballantine@skofirm.com
christopher.schaefer@skofirm.com

*Counsel for Defendant Center for Toxicology*
*and Environmental Health, LLC*

/s/ Jason W. Pfeiffer  w/permission
Jason W. Pfeiffer
Denise S. Rahne
Audrey E. Burnett
ROBINS, KAPLAN, MILLER & CIRESI, LLP
800 LaSalle Avenue, 2800 LaSalle Plaza
Minneapolis, MN 55402
Telephone:  (612) 349-8500
Facsimile:  (612) 339-4181
jwpfeiffer@rkmc.com
dsrahne@rkmc.com
aeburnett@rkmc.com

/s/ L. Miller Grumley  w/permission
L. Miller Grumley
Jonathan Freed
BRADLEY, FREED & GRUMLEY, PSC
1634 Broadway, P.O. Box 1655
Paducah, Kentucky 42002
Telephone:  (270) 443-0040
Facsimile:  (270) 575-5498
mgrumley@kentuckylawyers.com
jfreed@kentuckylawyers.com

*Counsel for Defendants Paducah & Louisville*
*Railway, Inc., P&L Transportation, Inc., and*
*Four Rivers Transportation, Inc.*

John L. Tate
STITES & HARBISON, PLLC
400 West Market Street, Suite 1800
Louisville, KY  40202-3352
Telephone:  (502) 587-3400
Facsimile:  (502) 587-6391
jtate@stites.com

*Counsel for Defendants RAE Systems, Inc. and Honeywell International Inc.*

/s/ James M. Mooney  w/permission
James M. Mooney
Moynahan Irvin Mooney PSC
110 North Main Street
Nicholasville, KY 40356
Telephone:  (859) 887-1200
Facsimile:  (859) 354-4216
jmooney@mimfirm.com

*Counsel for Defendant R.J. Corman Derailment*
*Services, LLC*


Mark P. Bryant
William K. Shannon
Bryant Law Center, PSC
601 Washington Street
P.O. Box 1876
Paducah, KY 42002-1876
Telephone:  (270) 442-1422
Facsimile:  (270) 443-8788
mark.bryant@bryantpsc.com
kevin.shannon@bryantpsc.com

/s/ Jasper D. Ward  w/permission
Jasper D. Ward
Alex C. Davis
JONES WARD PLC
Marion E. Taylor Building
312 S. Fourth Street, 6th Floor
Louisville, Kentucky 40202
Telephone:  (502) 882-6000
Facsimile:  (502) 587-2007
jasper@jonesward.com
alex@jonesward.com

*Counsel for Plaintiffs and Proposed Class*


Calvin C. Fayard, Jr.
D. Blayne Honeycutt
Wanda J. Edwards
FAYARD & HONEYCUTT, APC
519 Florida Avenue, SW
Denham Springs, LA 70726
Telephone:  (225) 664-4193
calvinfayard@fayardlaw.com
dbhoneycutt@fayardlaw.com
wandaedwards@fayardlaw.com

*Counsel for Plaintiffs and Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2014, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all ECF users registered with the Court for this case.

/s/ Thomas H. Dupree, Jr.
Thomas H. Dupree, Jr.
Michael K. Murphy
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539
tdupree@gibsondunn.com
mmurphy@gibsondunn.com

*Counsel for Defendant CSX Transportation, Inc.*

23